IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| **TERRY HOUSTON,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No.: GJH-15-2507** |
| | * | |
| **SHIRLEY KIRKLAND,** | | |
| ***et al.,*** | * | |
| **Defendants.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

In this action, Plaintiff Terry Houston ("Plaintiff" or "Ms. Houston") brings suit against

Defendants Shirley Kirkland, President of the American Federation of State, County, and

Municipal Employees, AFSCME Local 2250 ("Local 2250" or "the Union") and the Executive

Board of Local 2250 (collectively, "Defendants"), alleging various violations under the

Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII")

and the Age Discrimination in Employment Act ("ADEA"). Presently pending before the Court

is Defendants' Motion for Summary Judgment, ECF No. 7. A hearing on the motion was held on

November 16, 2016. Local Rule 105.6 (D. Md.). For the following reasons, Defendants' Motion

for Summary Judgment is granted, in part, and denied, in part.

### I.     BACKGROUND[1]

Terry Houston is a 70-year old African-American female suffering from "severe Asthma[2]

and Reflex Sympathetic Dystrophy (RSD) also known as Complex Regional Pain Syndrome.[3]"

---

[1] As this Opinion addresses Defendants' motion for summary judgment, all facts herein are taken from the record as a whole, but viewed in the light most favorable to the Plaintiff.

ECF No. 1 at 3. [4] Since 1986, Ms. Houston has served in various administrative capacities with Local 2250, a union for public-sector employees working in Prince George's County Public Schools ("PGCPS"). *Id.* Ms. Houston was promoted to Administrative Assistant in 1996, a position she held until 2012, at which time she became a "Membership Specialist." ECF No. 1 at 3; ECF No. 13-1 at 1. At all times relevant to the action, Ms. Houston worked as part of an office staff of nine full-time employees for the Union.[5] ECF No. 7-2 at 2; ECF No. 12 at 9–11.

### A. Union Pay Cuts

In mid-2011, discussions regarding salaries for Union staff took place between Daniel Besseck, the Executive Director of Local 2250, and the Executive Board ("the Board"). ECF No. 7-2 at 3. The Board "decided that they wanted to end the individual employment staff contracts and return to staff positions tied into the PGCPS collective bargaining agreement as done in the past." *Id.* ¶ 5. In December 2011, the Board "adopted new salary scales based on the PGCPS bargaining pay scales." *Id.* ¶ 6. Mr. Besseck was directed to implement the new salary scales and notify employees where they would fall on the new scales. *Id.* The new salary scales were designed to take effect in January or February of 2012 when the employment contracts were due to expire. *Id.* In January 2012, the Board decided to extend the employment contracts until May

---

[2] Asthma is "a chronic (long-term) lung disease that inflames and narrows the airways." *What is Asthma?*, National Heart, Lung, and Blood Institute (Aug. 4, 2014), https://www.nhlbi.nih.gov/health/health-topics/topics/asthma.
[3] Reflex Sympathetic Dystrophy or Complex Regional Pain Syndrome ("CRPS") is a "chronic pain condition most often affecting one of the limbs (arms, legs, hands, or feet), usually after an injury or trauma to that limb . . . CRPS is characterized by prolonged or excessive pain and mild or dramatic changes in skin color, temperature, and/or swelling in the affected area . . . CRPS symptoms vary in severity and duration. Studies of the incidence and prevalence of the disease show that most cases are mild and individuals recover gradually with time. In more severe cases, individuals may not recover and may have long-term disability."" *Complex Regional Pain Syndrome Fact Sheet*, National Institute of Neurological Disorders and Stroke (June 2013), http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/detail_reflex_sympathetic_dystrophy.htm.
[4] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to page numbers generated by that system.
[5] The Union office staff included Terry Houston (Black, female, age 70); James Spears, Jr. (Black, male, age 60); Courtney Wright (White, female, age 67); Fred Shumate (Black, male, age 74); Renee Dixon (Black, female, age 54); Lisa Clemons (Black, female, age 44); Adolfo Botello (Hispanic, male, age 69); Angela Thomas (Black, female, age 65); Dan Besseck (White, male, age 54). ECF No. 7-2 at 18; ECF No. 12 at 10–11 (ages current as of April 2016).

2

2012, and directed Mr. Besseck and the Union's General Counsel to further review the salary

scales and report back to the Board with a recommendation by April 2012. *Id.* ¶ 7. Mr. Besseck

"performed a market analysis" on the proposed salary scales, comparing the salaries "to

comparable positions within the area." *Id.* ¶ 8. Mr. Besseck reportedly used several entities and

organizations in the "market analysis," including PGCPS, the Association of Supervisory and

Administrative School Personnel (ASASP), the Prince George's County Educators' Association

(PGCEA), and the Maryland State Education Association (MSEA). ECF No. 7-2 at 20–21. Mr.

Besseck ultimately used the MSEA wage rates as a guideline and created new wage rate tables

based on these figures. ECF No. 7-2 at 4.[6] The board voted to offer jobs to all current staff based

on the revised job description and salary structure. *Id.* ¶ 11.

Following these developments, Mr. Besseck and the Board decided to change Ms.

Houston's job title from "Administrative Assistant" to "Membership Specialist" and reduce her

salary from $91,582.40 to $58,695.40, a decrease of over 35%. ECF No. 13-1 at 3. Five other

full-time employees were also affected by the pay cuts.[7] Mr. Besseck informed Ms. Houston and

the other Union employees of the proposed changes in April 2012. ECF No. 7-2 at 4–5. Mr.

Besseck told Ms. Houston that her salary was being reduced because she was "old enough to

collect social security" and was planning on retiring. ECF No. 1 ¶ 14. Ms. Houston had never

told Mr. Besseck or the Board that she was planning on retiring. *Id.* ¶ 15. Ms. Houston was told

that if she did not accept the pay reduction, she would no longer have a job. ECF No. 12 at 8.

---

[6] The "Cost Market Analysis for Terry's Position of Administrative Assistant," indicates that Ms. Houston would be entitled to a salary of $85,217.60 under the PGCPS scale, $87,026.00 under the ASASP scale, and $76,115.64 under the PGCEA scale. ECF No. 7-2 at 21. Under the scale implemented, Ms. Houston was entitled to $58,695.00. ECF No. 7-2 at 35.

[7] James Spears, Jr. (then age 57) had his salary reduced from $75,004.80 to $73,798.40, a decrease of 1.6%. Courtney Wright (then age 63) had her salary reduced from $91,582.40 to $78,561.60, a decrease of 14.2%. Fred Shumate (then age 70) had his salary reduced from $52,000.00 to $51,896.00, a negligible decrease. Renee Dixon (then age 50) had her salary reduced from $69,347.20 to $58,695.00, a decrease of 15.4%. Lisa Clemons (then age 40) had her salary reduced from $50,918.40 to $49,233.60, a decrease of 3.5%. Thus, by a significant margin, Ms. Houston experienced the largest pay reduction percentage-wise. ECF No. 7-2 at 18; ECF No. 12 at 10.

Ms. Houston therefore accepted the revised job title and salary on April 30, 2012. ECF No. 7-2, Exhibit F.

Affidavits submitted by Joseph Greer, who was a member of the Board at the time of the salary reductions, and Shirley Adams, former president of Local 2250, cast doubt on the purpose of the "market analysis" that led to the salary cuts. ECF No. 13-11; ECF No. 13-2.[8] Mr. Greer states that "Daniel Besseck targeted Ms. Houston and reduced her salary substantially." He further states that "[a]fter Mr. Besseck realized that the Office Manager [Courtney Wright]'s salary was also going to be reduced, he became so outraged that he banged his fist on the table and stated that would be a hardship for Ms. Wright if the board reduced her salary. He was then asked what about Ms. Houston's hardship and he never answered." ECF No. 13-11 at 2. Ms. Adams states that "[t]he Executive Board had other options[,] which were to allow the staff employees to keep the salaries they earned; to hire all new employees at the new rate; or to freeze the staff's salaries for a specified number of years. Mr. Besseck stated the decrease in salary was intended only for Terry Houston . . ." ECF No. 13-12 ¶ 6.

## B. Ms. Houston's Workplace Injury and Worker's Compensation Checks

On May 1, 2012, Ms. Houston suffered an injury at work. ECF No. 1 ¶ 3. While carrying files down an outdoor flight of concrete steps, Ms. Houston slipped and fell, tearing the rotator cuff in her shoulder and injuring her wrist. *Id.* Ms. Houston was out of work for several months, and began receiving worker's compensation checks from the Union's Injured Workers Compensation Fund (IWIF). ECF No. 1 ¶ 4. She also began depleting her accrued sick and annual leave by June 2012. *Id.*[9] An IWIF doctor cleared Ms. Houston to go back to work in mid-

---

[8] Plaintiff submits two versions of Ms. Adams' affidavit: ECF No. 13-2 at 1; ECF No. 13-12 at 2.

[9] The record is unclear as to when Ms. Houston was able to start using her leave. A Memo from Shirley Adams to Daniel Besseck, dated June 11, 2012, indicates that Ms. Adams requested that "Terry Houston be permitted to use and exhaust all her annual and sick leave before going on worker's compensation temporary total benefits at this

4

August 2012, but Ms. Houston was still experiencing pain. ECF No. 1 ¶ 4–5. Ms. Houston met

with an orthopedic doctor and a subsequent MRI revealed a broken bone in her wrist. *Id.* Ms.

Houston "requested accommodation from the Defendants but was denied and told that she had to

return to work or she would be terminated." *Id.* ¶ 5.[10]

For a period of time after her injury, Ms. Houston's worker's compensation checks were

sent to the Union office instead of to her home address. ECF No. 7-6 at 4. This required Ms.

Houston to go to the office to pick up her checks. ECF No. 7-5 at 2. On July 30, 2012, Ms.

Adams sent a memo to Mr. Besseck, notifying him that "the decision you made regarding Terry

Houston's Worker's Comp check to be mailed to the union office and opened instead of being

mailed to her home is not the normal procedure this union has followed in the past." ECF No.

13-12 at 4. Ms. Houston also sent a memo to Mr. Besseck on August 2, 2012, requesting that her

worker's compensation checks be sent to her house. ECF No. 7-6 at 4.

### C. First EEOC Charge and Determination

On August 31, 2012, Ms. Houston filed a complaint with the Equal Employment

Opportunity Commission (EEOC), alleging that she had been discriminated against based on

race and age. ECF No. 7-3. On the charge form, Ms. Houston checked the "race" and "age"

boxes, but did not check the "disability" box. In her narrative, Ms. Houston stated:

> I am the oldest employee in the office.[11] Prior to July 2012, I and
> Office Manager Courtney Wright (White, 62) received the same
> salary, $91.574. In March 2012, I was informed my salary would
> be lowered to $58,000 effective July 1, 2012 . . . I am aware Ms.
> Wright's salary was only lowered to approximately $80,000. I am
> also aware that Ms. Wright has the opportunity to earn more by

time." ECF No. 13-12 at 5. It is also undisputed that by the end of December 2012, Ms. Houston had exhausted all
of her leave. ECF No. 7-4 at 5; ECF No. 13-1 at 7. Hence, it is not at all clear when Ms. Houston was "denied" use
of her leave or whether she even retained accrued leave to use.

[10] The record is also unclear as to what kind of "accommodation" Ms. Houston requested from Defendants or the
time or nature of these discussions.

[11] This statement appears to be incorrect, as employee Fred Shumate was four years older than Ms. Houston. ECF
No. 12 at 10.

5

moving up her pay scale, whereas I have already been placed at the
top of my pay scale and so have no room for advancement.

ECF No. 7-3 at 2. Ms. Houston also claimed that "in June 2012, while I was out of work due to
injury, Mr. Besseck subjected me to unequal terms and conditions by not allowing me to use my
accrued leave in order to be paid my full salary. I am aware that other employees have been
given this option." *Id.* Ms. Houston further claimed that "Mr. Besseck told me that I made too
much money. When asked about my salary reduction, the Executive Board told me they had
heard I was going to retire and stated that I am eligible to receive social security." *Id.*

### D. January 24, 2013 Dispute

Following Ms. Houston's workplace injury, she did not return to work full-time
throughout the Fall of 2012, although she worked some half days. ECF No. 7-2 at 6; ECF No.
13-10 at 12. By December 22, 2012, Ms. Houston had used up all of her sick and annual leave.
ECF No. 7-2 at 6; *see also* ECF No. 7-4 at 5. On January 24, 2013, Ms. Houston was scheduled
to work, but she did not come in. ECF No. 7-6 at 4. Ms. Houston submitted a leave request form
to Mr. Besseck dated January 25, 2013, which would have paid her for the eight hours missed.
However, Mr. Besseck testifies in his affidavit that he never received the leave request, and that
the timesheet Ms. Houston submitted indicated only that she was "off" for January 24, 2013, not
on "sick leave." ECF No. 7-2 at 7. Therefore, Mr. Besseck denied Ms. Houston pay for this day.
Ms. Houston also met with Mr. Besseck about this issue on March 12, 2013, where he explained
his reasoning for not paying her. *See* ECF No. 7-2.

### E. Second EEOC Charge and Determination

On March 19, 2013, Ms. Houston filed a second charge with the EEOC, alleging that the
Union had retaliated against her after she had filed the first EEOC charge. ECF No. 7-5 at 2. On
her second charge form, Ms. Houston checked the box for discrimination based on "retaliation"

6

and stated, "I filed a charge on June 1, 2012. Since that time I have received disparate treatment in the form of my workmen comp check is mailed to the employer instead of being mailed to me." *Id.* She further stated, "[o]n January 24, 2013, my check was short one day. I submitted a leave slip for that day, and I should be paid for that day. Daniel Besseck, Executive Director stated that my leave had nothing to do with my workmen comp. I feel that my employer is trying to force me to retire." *Id.*

The EEOC re-opened the investigation of Ms. Houston's first charge on January 9, 2013. ECF No. 13-10 at 2, and Ms. Houston filed a subsequent EEOC "intake questionnaire"[12] on November 28, 2014. *Id.* at 4–7. On this questionnaire, Ms. Houston again claimed that the basis of her claim was "retaliation." *Id.* at 5. She further stated that "Yes, I have a disability – Rt. arm limited use and driving." *Id.* at 6. But Ms. Houston answered "None" in response to the question: "What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything?" *Id.* Ms. Houston also answered "No" to the question: "Did you ask your employer for any changes or assistance to do your job because of your disability?" *Id.*

### F. Present Action

Ms. Houston filed the instant Complaint with the Court on August 25, 2015. ECF No. 1. Ms. Houston has brought four claims against Defendants: (1) violation of the Americans with Disabilities Act (ADA) for intentionally discriminating against her on the basis of disability and failing to accommodate her disability; (2) violation of Title VII of the Civil Rights Act of 1964 for subjecting her to harassment culminating in a hostile work environment; (3) violation of Title VII of the Civil Rights Act of 1964 for retaliating against her in the form of "refus[ing] to

---

[12] The questionnaire submitted by Plaintiff is handwritten and difficult to read in some areas. ECF No. 13-10. Plaintiff provides no other documentation of this charge.

accommodate her disability" and "intentionally cut[ting] her salary"; and (4) violation of the Age

Discrimination in Employment Act (ADEA) for intentionally discriminating against her because

of her age. *Id.* Defendants moved for summary judgment on March 28, 2016. ECF No. 7.[13]

## II.   STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the

governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue over

a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.* In undertaking this inquiry, the Court must consider the facts and all

reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris,* 550

U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to

prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt,* 999 F.2d

774, 778–79 (4th Cir. 1993).

## III.   ANALYSIS

### A.   Americans with Disabilities Act (ADA) Claim

Plaintiff alleges that Defendants violated the ADA when they intentionally discriminated

against her on the basis of her disability and denied her accommodations for her disability. ECF

No. 1 at 10–11. Because Plaintiff has failed to exhaust her administrative remedies and has not

---

[13] On April 11, 2016, Plaintiff moved for an extension of time to respond to Defendants' Motion for Summary Judgment, requesting a deadline of April 18, 2016. ECF No. 8. Plaintiff missed this deadline, and Defendants opposed Plaintiff's motion for an extension of time on April 22, 2016. ECF No. 9. Plaintiff filed her Response in Opposition to the Motion for Summary on April 26, 2016. ECF No. 12. Defendants renewed their objection to Plaintiff's filing of her Opposition in their Reply, ECF No. 16. At the motions hearing, counsel for Plaintiff explained at a bench conference that a family emergency had precluded her from meeting the self-imposed deadline of April 18, 2016. Upon consideration of this matter, the Court finds that, pursuant to Fed. R. Civ. P. 6(b)(1)(B), Plaintiff's counsel has made a showing of "excusable neglect," and the Court will thus consider Plaintiff's Opposition filed April 26, 2016, ECF No. 12, in its Decision.

established sufficient facts to show that Defendants were on notice of her disability or that Defendants took adverse action against her because of her disability, summary judgment must be granted for Defendants on this claim.

Both the ADA and Title VII require a plaintiff to "exhaust her administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court." *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012). Failure to exhaust administrative remedies deprives the Court of subject matter jurisdiction. *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). "The scope of a plaintiff's right to file a federal lawsuit is determined by the charge's contents." *Id.* (citing *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009)). Thus, a plaintiff "fails to exhaust [her] administrative remedies where . . . [her] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in [her] formal suit." *Id.* (citing *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005)). A plaintiff's claim "generally will be barred if [her] charge alleges discrimination on one basis-such as race-and [she] introduces another basis in formal litigation-such as sex." *Chacko*, 429 F.3d at 509.

Far from a "formality to be rushed through," the exhaustion requirement is "an integral part of the Title VII [and ADA] enforcement scheme." *Sydnor*, 681 F.3d at 593 (quoting *Chacko*, 429 F.3d at 510). Requiring a party to first file a charge with the EEOC "ensures that the employer is put on notice of the alleged violations," giving the employer the chance to address the alleged discrimination prior to litigation. *Sydnor*, 681 F.3d at 593 (quoting *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005)). Allowing the EEOC "the first crack at these cases" respects Congress's intent "to use administrative conciliation as the primary means of handling claims." *Sydnor*, 681 F.3d at 593 (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).

At the same time, however, exhaustion requirements should not "erect insurmountable barriers to litigation out of overly technical concerns," particularly where plaintiffs are laypersons. *Sydnor*, 681 F.3d at 594 (citing *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008)). Accordingly, if a plaintiff's claims in the judicial complaint are "reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation," she "may advance such claims in her subsequent civil suit." *Sydnor*, 681 F.3d at 594 (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000)).

Here, Ms. Houston did not exhaust her administrative remedies with respect to disability-based discrimination. In Ms. Houston's first EEOC charge, filed August 31, 2012, Ms. Houston clearly alleged that she had been discriminated against based on "race" and "age." ECF No. 7-3. Ms. Houston did not check the box for "disability," nor did she reference a disability anywhere in her narrative. Ms. Houston instead stated, "I believe I have been discriminated against with respect to wages and terms and conditions of employment because of my age (66) . . . and my race (Black)." Ms. Houston later stated, "while I was out of work due to injury, Mr. Besseck subjected me to unequal terms and conditions of employment by not allowing me to use my accrued leave in order to be paid my full salary." While Ms. Houston noted being out of work due to injury, nowhere does Ms. Houston reference, or put her employer on notice of, her now-stated disabilities of "severe Asthma and Reflex Sympathetic Dystrophy (RSD) also known as Complex Regional Pain Syndrome." In fact, the first time this diagnosis appears in the record is from a doctor's report dated April 10, 2013. ECF No. 13-7 at 6. Additionally, read in the context of the other claims alleging race and age discrimination in the body of the charge, Ms. Houston's

claim related to her "injury" is most reasonably interpreted to allege that "not allowing [her] to use [her] accrued leave" was also based on her race or age, not on disability.[14]

In Ms. Houston's second EEOC charge dated March 19, 2013, she again fails to allege disability-based discrimination. ECF No. 7-5. In this charge, Ms. Houston checked the "retaliation" box, but once again did not check the "disability" box. *See id.* Ms. Houston further stated that she had received disparate treatment since filing the first charge, and that her "employer is trying to force [her] to retire." *Id.* In the EEOC intake questionnaire dated November 28, 2014, Ms. Houston yet again did not allege discrimination based on disability. ECF No. 13-10. In fact, Ms. Houston answered "No" to the question: "Did you ask your employer for any changes or assistance to do your job because of your disability." *Id.* Ms. Houston also answered "None" in response to the question: "What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything?" *Id.* Hence, Ms. Houston's employer had no chance to address the alleged discrimination based on disability, and Ms. Houston therefore failed to exhaust her administrative remedies with respect to her disability-based discrimination claim.[15]

As to the failure-to-accommodate claim, the phrasing of the first EEOC charge presents a closer issue on the question of exhaustion. ECF No. 7-3 at 2. Although, as stated earlier, the charge is clearly made in the context of a claim of racial and age-based discrimination, Plaintiff does mention a request for leave being denied which, arguably, could provide notice of a failure-

---

[14] The point is reinforced by Ms. Houston's next sentence claiming "that other employees have been given this option," which indicates that she is alleging other "injured" employees were given leave, while she was not — presumably because of her race or age. *See* ECF No. 7-3 at 2.

[15] Even if Plaintiff's disability-based discrimination claim were administratively exhausted, it fails on other grounds. First, Plaintiff has not established sufficient facts to show that her employer knew of her disabilities, "severe Asthma and Reflex Sympathetic Dystrophy or Complex Regional Pain Syndrome." *See Baker v. Chesapeake*, 644 F.App'x 222, 224 (4th Cir. 2016). Plaintiff has also not established that but-for her disability, Defendant would not have taken an adverse employment action against her. *Gentry v. East West Partners Club Mgmt. Co., Inc.*, 816 F.3d 228, 235–36 (4th Cir. 2016) (discussing causality requirement).

11

to-accommodate claim that would have been discovered through reasonable investigation. *See Sydnor*, 681 F.3d at 594. The Court need not resolve whether this claim is exhausted, however, because as a substantive matter the claim does not survive summary judgment.

To establish a failure-to-accommodate claim under the ADA, the plaintiff must show that: (1) she had a disability within the meaning of the statute; (2) her employer was on notice of this disability; (3) she could perform the essential functions of the job with reasonable accommodation; and (4) her employer refused to provide those accommodations. *Pollard v. Baltimore Cty. Bd. of Educ.*, 65 F. Supp. 3d 449, 456 (D. Md. 2014) (citing *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)). "Nearly every circuit court, including the Fourth Circuit, has held or strongly suggested that the Plaintiff bears the initial burden of requesting, identifying, or proposing a reasonable accommodation." *Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 716 n.4 (D. Md. 2013). A request for leave "will not be unreasonable on its face so long as it (1) is for a limited, finite period of time; (2) consists of accrued paid leave or unpaid leave; and (3) is shown to be likely to achieve a level of success that will enable the individual to perform the essential functions of the job in question." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 n.7 (4th Cir. 2013) (citing *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454 at 465–66 (4th Cir. 2012); *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)).

With respect to her prima facie case, Ms. Houston has failed to establish that Defendants were on notice of her disability, that she could perform the essential functions of the job with reasonable accommodation, or that her employer refused to provide those reasonable accommodations. First, Ms. Houston has not pointed to any evidence that Defendants knew she suffered from severe Asthma and RSD/CRPS at times relevant to the action, while Mr. Besseck does affirmatively state that he was not aware of Ms. Houston's disabilities. ECF No. 7-2 ¶ 24.

12

Second, Ms. Houston has not established what accommodations would have allowed her to

perform the essential functions of her job, or that she requested such accommodations from

Defendants. Ms. Houston alleges throughout various stages of litigation that she was "denied

leave." But Ms. Houston herself has acknowledged several times that not only did she use leave,

but she in fact exhausted her leave. ECF No. 13-1 at 7. Additionally, Plaintiff has not disputed

evidence provided in Mr. Besseck's affidavit that she was allowed to work "as many hours as

she felt she could do" or "consult via the telephone for a set period of hours each day" during the

relevant time period, ECF No. 7-2 ¶ 23; or explained why such accommodations were not

sufficient. Hence, Plaintiff's claim for failure to accommodate cannot survive summary

judgment.

### B. Hostile Work Environment Claim

Plaintiff next claims that Defendants subjected her to harassment, resulting in a hostile

work environment in violation of Title VII of the Civil Rights Act of 1964.[16] ECF No. 1 at 11–

13. As with Plaintiff's ADA claim, Ms. Houston has failed to exhaust her hostile work

environment claim.

Like other claims under Title VII, a hostile work environment claim must be

administratively exhausted before being brought in federal court. *Chacko*, 429 F.3d 505, 513 (4th

Cir. 2005). A generalized allegation of harassment that does not put an employer on notice that

its work environment is "permeated with discriminatory intimidation, ridicule, and insult" so as

to deem the environment "abusive," does not suffice to fully exhaust administrative remedies.

*See Byington v. NBRS Financial Bank*, 903 F. Supp. 2d 342, 351 (D. Md. 2012) (citing *Harris v.*

---

[16] In her Complaint, Plaintiff brings the hostile work environment claim under Title VII rather than under the ADA or the ADEA. The plain language of Title VII does not include disability or age as protected characteristics. 42 U.S.C. § 2000e-2. However, the Fourth Circuit has recognized hostile work environment claims on both the basis of disability and age. *Fox v. Gen. Motors Corp.*, 247 F.3d 169 (2001); *Causey v. Balog*, 162 F.3d 795 (1998).

13

*Forklift Systems, Inc.*, 510 U.S. 17, 17 (1993)). Nor is a claim exhausted when "the factual foundation in the administrative charge is too vague to support the hostile work environment claim raised in the Complaint." *Byington*, 903 F. Supp. 2d at 351 (citing *Chacko*, 429 F.3d at 509)).

In Plaintiff's first EEOC charge, she lists only three specific complaints over the course of a year, none of which, individually or collectively, could put her employer on notice of an abusive environment.[17] In her second EEOC charge dated March 19, 2013, Plaintiff states only that "I believe I have been retaliated against for engaging in a protect[ed] activity in violation of Title VII of the Civil Rights Act of 1964, as amended, with respect to harassment." ECF No. 7-5 at 2. Thus, Plaintiff did not put the employer "on notice that its work environment is permeated with discriminatory intimidation, ridicule, and insult so as to deem the environment abusive," and therefore did not exhaust her claim for hostile work environment.[18]

## C. Retaliation Claim

Plaintiff next alleges that Defendants retaliated against her for filing a complaint with the EEOC, in violation of Title VII and the ADA. ECF No. 1 at 14–15. In Ms. Houston's second EEOC charge, dated March 19, 2013, Ms. Houston checked the "retaliation" box and stated, "I filed a charge on June 1, 2012. Since that time I have received disparate treatment in the form of my workmen['s] comp check is mailed to the employer instead of being mailed to me." ECF No.

---

[17] As discussed earlier, Plaintiff's first charge complains of (1) her salary reduction, (2) denial of leave, and (3) being told by Defendants she made too much money and that she was believed to be planning to retire. ECF No. 7-3 at 2.

[18] Further, Plaintiff does not address her hostile work environment claim in her Opposition, ECF No. 12, and thus appears to have conceded it. *See Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (finding that Plaintiff abandoned claim by failing to address it in her opposition to Defendant's motion for summary judgment). Even if Plaintiff's hostile work environment claim were exhausted, it would still be dismissed on the merits, as the facts put forth by Plaintiff do not clear the "high bar in order to satisfy the severe or pervasive test" of a hostile work environment claim. *Equal Emp't Opportunity Comm'n v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (distinguishing actionable "hostile work environment" from mere "rude treatment by coworkers, . . . callous behavior by one's supervisor, . . . or a routine difference and opinion and personality conflict with one's supervisor") (internal citations omitted).

14

7-5 at 2. She further stated, "On January 24, 2013, my check was short one day. I submitted a

leave slip for that day, and I should be paid for that day. Daniel Besseck, Executive Director

stated that my leave had nothing to do with my workmen comp. I feel that my employer is trying

to force me to retire." *Id.* In her instant Complaint, Ms. Houston claims that the retaliation

occurred when Defendant refused to accommodate her disability and cut her salary. ECF No. 1 ¶

41.[19]

To establish a claim for retaliation under Title VII or the ADA, plaintiff must show that

1) she engaged in a protected activity, 2) her employer took adverse employment action against

her, and 3) a causal connection exists between the protected activity and the adverse action.

*Diggs v. Bd. of Educ. of Baltimore Cty.*, Civil Action No. RDB-14-715, 2015 WL 5604278, at

*14 (D. Md. Sept. 23, 2015) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68

(2006)); *see also Reynolds v. American Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012)

(stating same test for retaliation claim under ADA). "The antiretaliation provision [of Title VII]

protects an individual not from all retaliation, but from retaliation that produces an injury or

harm." *Fordyce v. Prince George's Cty. Maryland*, 43 F. Supp. 3d 537 (D. Md. 2014) (citing

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)) (alteration in original). To

prevail, plaintiff "must show a *materially* adverse employment action such that employer's

actions must be harmful to the point that they could well dissuade a reasonable worker from

making or supporting a charge of discrimination." *Id.* (emphasis in original). Further, in a Title

VII retaliation claim, causation must be shown "according to traditional principals of but-for

causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

---

[19] The relevant paragraph in the Complaint is inartful and reads, "Defendant [r]etaliated against Plaintiff when it refused to accommodate her disability from when Defendant intentionally [c]ut her salary." ECF No. 1 ¶ 41.

With respect to Ms. Houston's salary cut, Ms. Houston has not established a causal connection for the simple reason that the timing is implausible. The salary cuts of April 2012 took place well before Ms. Houston filed an EEOC charge, and thus, could not have been initiated in retaliation for Ms. Houston's filing of the charges. Regarding the mailing of Ms. Houston's worker's compensation checks to the office, this does not constitute a "materially adverse employment action," because such an action was not "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *See Burlington Northern*, 548 U.S. at 68 (noting that "petty slights or minor annoyances that often take place at work" do not deter filing complaints and thus are not "adverse employment actions"); *Kearns v. Northrup Grumman Systems Corp.*, Civil Action No. ELH-11-1736, 2014 WL 2170781, at *15 (D. Md. May 23, 2014) (finding that disbanding employee's team and changing his shift were not "adverse employment actions").

Additionally, Ms. Houston has cited nothing in the record demonstrating a causal link between the filing of the first EEOC charge in August 2012 and Mr. Besseck's denial of paid leave for January 24, 2013, or the alleged denial of leave in December 2012. To the contrary, Mr. Besseck states in his affidavit that Ms. Houston continued utilizing her leave from late August 2012, when the charge was filed, until she exhausted her leave on December 21, 2012. ECF No. 7-2 at 6. Ms. Houston similarly acknowledges that she used and exhausted her earned leave. ECF No. 13-1 at 7. To the extent she was not paid for the work day of January 24, 2013, Mr. Besseck explains that this was an oversight because Ms. Houston had not submitted the appropriate requests. ECF No. 7-2 at 7–8. The Court finds that no reasonable jury could find that this one failure to pay Ms. Houston was in retaliation for her filing a single EEOC charge five months earlier. Accordingly, Ms. Houston's retaliation claim fails as a matter of law.

### D.  Age Discrimination (ADEA) Claim

In her fourth and final claim, Plaintiff alleges that Defendants violated the ADEA when they intentionally discriminated against her because of her age. ECF No. 1 at 15–16. Specifically, Plaintiff claims that Defendants targeted her for a thirty-five percent cut in salary, informed her that she would never get another salary increase, and told her that her salary was being reduced "because she was old enough to collect social security and was planning on retiring." *Id.* at 7, 16.

To bring "a claim of age discrimination, a plaintiff may proceed through either of two avenues of proof." *Arthur v. Pet Dairy*, 593 F. App'x 211, 212 (4th Cir. 2015). Plaintiff may raise a "presumption of discrimination" by proving a prima facie case under the *McDonnell Douglas* framework, or plaintiff may offer "direct or circumstantial evidence of the employer's discriminatory animus." *See id.* Under either method, "the burden remains the same: plaintiff must prove that age was the but-for cause of [the adverse employment action]." *Id.*; *see also Gross v. FBL Financial Serv's, Inc.*, 557 U.S. 167, 177–78 (2009) (emphasis added). Other factors used in employment decisions, such as "years of service," which do not implicate "inaccurate and stigmatizing stereotypes about older workers" are "analytically distinct" from age. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 605, 610–11 (1993) (discussing Congress's intent under ADEA to prohibit discriminatory actions based on employers' belief that "productivity and competence decline with old age"). However, for age to be the "but-for cause," it need not be the "sole cause" of the adverse employment action. *Arthur v. Pet Dairy*, 593 F. App'x 211, 220 (4th Cir. 2015). "An employee need not refute . . . every possible legitimate ground for the employment decision to avoid summary judgment." *Id.* To survive summary judgment, a plaintiff need only provide "sufficient evidence to cast doubt upon the employer's

stated reason for the employment action, such that a reasonable juror may find age was the determinative factor in that decision." *Id.* at 221.

Plaintiff alleges that she prevails under both a direct or circumstantial evidence test, and under the burden-shifting framework of *McDonnell Douglas*. Thus, the Court will analyze her claim under both tests.

### i. Direct or Circumstantial Evidence Test

An ADEA plaintiff may prove age discrimination by "offering direct or circumstantial evidence of an employer's discriminatory animus." *Arthur v. Pet Dairy*, 593 F. App'x 211, 216 (4th Cir. 2015). The Fourth Circuit has defined "direct evidence" as evidence that the employer "announced, admitted, or otherwise unmistakably indicated that age was a determining factor." *Cline v. Roadway Express, Inc.,* 689 F.2d 481, 485 (4th Cir. 1982). It is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wagner v. Dillard Dep't Stores, Inc.*, 17 F. App'x 141, 148 (4th Cir. 2001) (quoting *Jacklyn v. Schering–Plough Healthcare Prods.,* 176 F.3d 921, 926 (6th Cir. 1999)). Direct evidence is "evidence of conduct or statements that reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps,* 67 F.3d 1137, 1142 (4th Cir. 1995).

"Derogatory comments may be direct evidence of age discrimination, provided they concern the employee's age and sufficiently demonstrate that the employer's age-related animus affected the employment decision at issue." *Arthur v. Pet Dairy*, 593 F. App'x at 218. Such comments must be "1) [r]elated to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of-adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the

18

employment decision at issue." *Id.* at 219. Likewise, with respect to circumstantial evidence of intentional discrimination, "an employer's false explanation about the circumstances of the *plaintiff's termination* [or other adverse employment action], accompanied by evidence that the employer acted with an illicit motive, may circumstantially prove discriminatory intent." *Id.*

Plaintiff claims she was discriminated against based on age when Defendants told her that her salary was being cut because she was "old enough to collect social security" and was going to retire soon, though she had never said she was planning on retiring. ECF No. 1 at 16. Ms. Houston states in her affidavit that "I was also repeatedly asked 'when are you going to retire.' I was told that I should retire and receive social security benefits and retirement." ECF No. 13-1 ¶ 10. Additionally, Plaintiff states that Mr. Besseck intentionally targeted her by changing her job title from Administrative Assistant to Membership Specialist, in order to facilitate the pay cut. ECF No. 12-1 at 2; ECF No. 13-1 ¶ 14. While Defendants urge the Court to dismiss Plaintiff's affidavit as self-serving, claims of animus against Ms. Houston are supported by additional affidavits. First, Plaintiff submits the affidavit of Joseph Greer, who was a member of the Executive Board at the time of the salary reductions, stating that "Daniel Besseck targeted Ms. Houston and reduced her salary substantially," and "Mr. Besseck also stated that the reduction in the office staff's salary and positions was only meant for Ms. Houston and no one else should be affected not Courtney, Renee, or Lisa." ECF No. 13-11. Second, Plaintiff also submits the affidavit of Shirley Adams, former president of Local 2250, who states that "Mr. Besseck stated the decrease in salary was intended only for Terry Houston." ECF No. 13-2 ¶ 6. Additionally, Adams recalls actions towards Houston which she viewed as designed to "force her into retirement." *Id.* ¶ 3.

Some comments or inquiries about retirement, without more, do not establish direct evidence of age-related discrimination. *See DeBarr v. Cleveland Clinic Foundation*, 918 F. Supp. 2d 676, 683 (N.D. Ohio 2013) (finding no direct evidence of age discrimination when supervisor allegedly asked employee when he was going to retire, because such a conclusion would require "inferences by a fact finder"); *Halloway v. Milwaukee Cty.,* 180 F.3d 820, 825 (7th Cir. 1999) (noting that requests that an employee retire are not necessarily a reference to the employee's age). But "while it is true that an employer's 'friendly' inquiries about retirement cannot usually support a finding of age discrimination . . . not all inquiries about retirement are 'friendly' and . . . repeated and unwelcome inquiries may certainly be relevant to a showing of age discrimination." *Leonard v. Twin Towers*, 6 F. App'x 223, 230 (6th Cir. 2001). Here, the repeated inquiries regarding Ms. Houston's future retirement, in the context of the affidavit testimony that she was being targeted, indicate that these were not friendly inquiries. Additionally, Mr. Besseck referenced not only Ms. Houston's allegedly impending retirement when he cut her salary by 35%, but also that she was "old enough to collect social security." ECF No. 1 ¶ 14. Hence, Mr. Besseck did not merely say Ms. Houston could or would collect social security, but that she was "old enough" to collect social security — making a direct reference to her age.

The Sixth Circuit's opinion in *Hale v. ABF Freight System, Inc.*, 503 F.App'x 323 (6th Cir. 2012) is instructive. In that case, the plaintiff-employee's immediate supervisor was overheard saying, "[Plaintiff] is going to leave here when he is 62. I am going to see it. He has been here long enough, and he is going to go on his social security." *Hale*, 503 F.App'x at 329. The court noted that while retirement and years of service are not synonymous with age, the supervisor's comment "was based not on an age-correlated factor but on age itself." *Id.* at 332.

The Sixth Circuit held that genuine issues of material fact as to age discrimination existed, and

therefore reversed the district court's granting of summary judgment to defendant-employer. *Id.*

at 335–36; *see also Leonard v. Twin Towers*, 6 F. App'x 223, 230–31 (6th Cir. 2001) (finding

that repeated inquiries about whether 68-year-old employee was going to retire could be

sufficient to allow rational jury to find that employer harbored age-related bias against him).

Similarly, here, there are genuine issues of material fact as to the existence of age discrimination,

and Plaintiff has put forth enough direct or circumstantial evidence to survive summary

judgment on her ADEA claim.

### ii. *McDonnell Douglas* **Burden-Shifting**

To establish a prima facie case of age discrimination under the *McDonnell Douglas*

framework, plaintiff must show: (1) she is at least 40 years old; (2) she suffered an adverse

employment action; (3) she was performing at a level that met her employer's legitimate

expectations at the time; and (4) similarly-situated, substantially-younger employees received

more favorable treatment. *See Cepada v. Bd. of Educ. of Baltimore Cty.*, 814 F. Supp. 2d 500,

513 (D. Md. 2011) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000));

*Dones v. Donahoe*, 987 F. Supp. 2d 659, 667 (D. Md. 2013); *Cureton v. Cianbro Corp.*, Civil

No. JFM-06-2303, 2006 WL 3537407, at *1 (D. Md. 2006) ("for the fourth element, the plaintiff

must demonstrate that [she] was replaced by or treated less favorably than someone

'substantially younger.'") (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308,

313 (1996)). If both the plaintiff and the younger employee are over the age of 40, most courts

have held that a gap of at least ten years is required to meet the "substantially younger" standard.

*See Kess v. Municipal Employees Credit Union of Baltimore, Inc.*, 319 F. Supp. 2d 637, 648–49

(D. Md. 2004) (citing *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336–40 (6th Cir. 2003);

*Jeffers v. Thompson*, 264 F. Supp. 2d 314, 328 (D. Md. 2003)). To establish that another employee is "similarly situated" to her, plaintiff must point to someone "who is directly comparable to [her] in all material respects except age and . . . received more favorable treatment." *Holtz v. Jefferson Smurfit Corp.*, 408 F. Supp. 2d 193, 206 (M.D.N.C. 2006) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002)).

Although Plaintiff has proffered sufficient evidence to proceed based on the direct or circumstantial evidence test, Plaintiff would not prevail under the *McDonnell-Douglas* burden-shifting analysis because she is unable to identify a similarly-situated employee who was substantially younger and treated more favorably. Including Ms. Houston, six employees were impacted by the cuts.[20] Employees Lisa Clemons (age 44), Fred Shumate (age 74), and Renee Dixon (age 54) were not similarly-situated to Ms. Houston because their salaries each started at a significantly lower point. Ms. Houston's salary before the cuts was $91,582.40, while the salaries of Ms. Clemons, Mr. Shumate, and Ms. Dixon were $50,918.30, $52,000, and $69,347.20, respectively. ECF No. 12 at 10 (citing to various documents in the record). Thus, while these three employees each received smaller pay cuts compared to Ms. Houston, they also began with significantly lower salaries. Courtney Wright began with the same salary as Ms. Houston and was given a much smaller reduction of 15% — but Ms. Wright is only three years younger than Ms. Houston and thus is not "substantially younger." ECF No. 7-2 at 18. The closest comparator is James Spears, Jr., who is ten years younger than Ms. Houston. *Id.* Mr. Spears was making a significant salary of $75,004.80 and experienced a salary reduction of less than 2%.[21] *Id.*; ECF

[20] *See* n.7 *supra*.

[21] In Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, ECF No, 12 at 10, Plaintiff states that Mr. Spears's salary before the cuts was $75,480.00 and thus he experienced a 3% cut. However, in both an attached Employee Information Report, ECF No. 13-5 at 7, and Ms. Houston's affidavit, ECF No. 13-1 at 2, Mr. Spears's pre-cut salary is listed as $75,004.80. Hence, Mr. Spears actually experienced less than a 2% cut when his salary was reduced to $73,978.40.

No. 13-1 ¶ 11. But the only evidence in the record regarding Mr. Spears' position at the Union is that he was a "field services director." ECF No. 7-2 at 56. Even viewing the evidence in the light most favorable to the Plaintiff, as the non-movant, the Court cannot, without more, find that a field services director is similarly-situated to Ms. Houston, who was an "administrative assistant" or "membership specialist" at times relevant to the action.

Thus, while Defendant's Motion for Summary Judgment will be denied as to this claim, Plaintiff will only be permitted to proceed based on direct or circumstantial evidence of age discrimination.

## IV.    CONCLUSION

For the foregoing reasons, Defendants Motion for Summary Judgment is granted, in part, and denied in part. Specifically, Plaintiff's ADA claim (Count I), hostile work environment claim (Count II), and retaliation claim (Count III) are dismissed. Plaintiff's ADEA claim (Count IV) survives, with the limitations described *supra*. A separate Order follows.

Date: December 7, 2016

George J. Hazel
United States District Judge